Good morning and welcome. We're ready to call our first case, United States of America v. Pena-Columna. Counsel? Good morning, Your Honor. Please support Joseph Jerusalem on behalf of the appellant Samuel Pena-Columna. I'd like to reserve five minutes for a rebuttal. Done. Judge Jordan, in deference to the way that you, in my experience, typically handle these cases, I'm going to forgo my prepared remarks and just open it up to questioning. If, of course, if the appellant doesn't have any questions, I'll proceed to my prepared remarks. No, that's okay by me and I'm sure my colleagues have questions. I certainly have some for you. So why don't we start with this. Is saying I need an attorney the same thing as saying I want an attorney, Mr. Jerusalem? Actually, I think it's more, if I could provide an example, there are many things in this world that I want. There are few things in this world that I need. So when I say I need something, to me, that's a heightened level of desire. And so when my client said that he needs an attorney, for me, that shows and evinces a level of his desire to have counsel on his behalf greater than just wanting an attorney. But there, we've got case law, right, that says, in fact, there's that Seventh Circuit case, Wissinger, where the court said, do I need a lawyer is a substantively different question than can I have a lawyer. And they didn't accept the framing you've given. They said, if you want a lawyer, you got to say, I want a lawyer. Why, tell me why we wouldn't follow that precedent? Well, Your Honor, I submit that within the context of this case, the questioning that my client received, and I'll turn the court's attention to joint appendix 206, where my client said, I have a right to an attorney, comma, right, question mark, if I'm under arrest. But at that point, and the record evidence is clear, both Agent Ashley and the U.S. Attorney's Office had already came to the conclusion that there was probable cause to an arrest. My client was taken from St. John via boat to St. Thomas, then placed in an FBI interrogation room. But you're asking us to look beyond the point of the conversation between the agent and the, start that, you're asking us to look beyond the conversation that was happening at the moment. And isn't a fair inference from what he said, focusing on your statement at 206? No, I think if I'm under arrest, I have a right to an attorney. Well, I put it this way, Judge Schwartz, if the agents had been honest with my client and said, you, actually, you're under arrest, then the question of, if I'm under arrest, I need an attorney, it would have been, and I could perceive the question going something like this, if I'm under arrest, I need an attorney, right? You're under arrest. Well, then I need an attorney. But that event didn't happen until a couple exchanges later, where he sort of repeated a similar theory, and I want to use the whole quote, because the brief only has a piece of it, and for the record, we're at 208. No, then it's unintelligible, that if I'm under arrest, I need an attorney. I mean, even if afterwards, you know, the family can get me another one to Maine. One, no, because I'm already under arrest, and I used to work for you, right? Question mark. The next thing the agent does is take a break. A few minutes pass. They then say, you're under arrest, and give him his earlier invocation, and a decision to arrest, when there was a break, and then a decision, and then the announcement of arrest. Well, Judge Torres, I would say you would have to back up and not look at that last statement in isolation. I would submit, I believe it's under the Supreme Court cases of Roberson and at the end of the sequence, in other words, the court needs to look at the first request for an attorney, and if the first request for attorney is not scrupulously answered, the court can't then back in ambiguity by using something that's said. I'll agree to that, but how is the request, no, I think if I'm under arrest, if I have a right to an attorney, right? How is that unambiguous? Davis is very clear that it has to be an unambiguous, unequivocal request. Well, Judge Torres, I would submit that the ambiguity and the lack of equivocation has to be taken in context, and I think the, if I'm under arrest, it was clear to me, and I think the record evidence carried this out, he was under arrest, and the agents, they didn't inform him of what they already subjectively knew. If they informed him what they subjectively knew, and what the U.S. Attorney's Office communicated to the agents, we'd be in a very different procedural posture than what we have. But the focus is an objective inquiry on what the defendant said, not what the subjective thinking of the agent is, in order for an agent to be able to act on that unequivocal assertion. I'm gonna have to push back on that a little bit, Judge Schwartz, because the fact that I understand it is not subjective intent or the subjective belief of the agents, and I have no problem with that, but what the agents can do is then rely on the fact that their subjective belief, you know, has no impact, and what they say has no import and factors into none of the equation. In other words, you can't extract the one half of the conversation and then just look at my client or any criminal defendant's statement. It has to be taken in contextually, and in this case, he was under arrest, and it was clear he expressed that he believed, mistakenly, he didn't understand the actual law, but if he actually was informed that he was under arrest, which was the case, then it would have been clear that he was entitled to an attorney he believes he should have gotten it. Well then, let's work with context. At the second statement that you focus on in your briefing is the one I've read out loud for the record. At 208? Right. Then the next thing happens is a break, an announcement of you're under arrest, and then he's re-advised of his statement. He then starts talking, and the agents at least twice say, wait a minute, let me make sure, I'm paraphrasing, that you really want to talk to us, and so aren't they doing exactly what Davis suggested but didn't require? That is, if there's any kind of question about the assertion, that the agents can go back and continue to say, but wait a minute, I just gave you a Miranda's, are you sure you want to talk to us? So, I mean, your reliance on the second statement. No, Judge, I would say like this. If the second statement had been the only statement, or had been the first statement, we'd be in a very different procedural posture. But what we can't have is the proverbial, you know, let's talk to my client, or talk to a criminal defendant, and beat around the bushes, and have equivocation, and then halfway through the interrogation, because mind you, this already happened on St. Thomas after he'd already been in the car and interrogated on St. John. Well, that raises an important point. The United States seems to concede that if both of these events, that is, the St. John questioning and the St. Thomas questioning constitute custodial interrogation, then they've got a problem. But their argument appears to be that if the St. John, if one or the other isn't the custodial interrogation, it's not a problem. So let's focus on the St. John. First off, do you agree with that? That if one of these things is not a custodial interrogation, then it's harmless error, because they both ended up implicating your client in the same way. No, Judge. And the reason is that if they were mirror images of each other, then yes, I would agree with that. Because then there will be no harm. I can't argue that in good faith. But the questioning, they were not mirror images. And importantly, the second questioning was on tape. So when you get videotape and a transcript played to a jury, obviously a jury can believe what they see and have much more faith in the evidence, versus the first encounter on St. John where it was not recorded and there could have easily been a he said, she said, I didn't say that. And then obviously the finder of fact can conclude that I'm not going to give as much weight to what happened on St. John versus what happened on St. Thomas, because on St. Thomas, they hit the proverbial play button. And so I would have to push back on the government's assertion that I would need to show that both instances were improperly admitted for there to be harm. I just had one question on the 404B point. I just want to make sure I understand what the scope of your argument is. There is the activity that happened, right? And then we have a history, so to speak, of alleged relationship between Alaska and your client. Are you challenging only the 404B ruling as it relates to the history, not the September event? Your briefing seems to really focus on the history, and I just want to make sure that's really what you're challenging. Yes, Judge Schwartz, and I think it's important for me to On the first day, the first day of trial, they talked about, in their opening, a long-standing business relationship. And I plan on asking the government about that, so I'm with you. And then, you know, at the end of the first day, the trial court said that's not 404B. And then the second day, the government shifted to less than one month before the September 2019 events. But then on the third day, they shifted back to the long-standing conspiracy concepts. And then at that point, the district court concluded that it was admissible, but not 404B. Then on the fourth day, the government proffered testimony from the LASCO, saying, and the trial court concluded that this was 404B. So my, well, I've got many problems with this, but to answer the question directly, I do have a substantial problem with the two years, which is what the evidence turned out to be, that Mr. LASCO and my client were in a criminal conspiracy together for the two years predating September 2019. If it had only been the weeks or the days before September 2019, you know, I won't have a problem with that. But that, but not only the temporal aspect, but the shifting nature, and importantly, but I understand your argument. I just want to know which piece of evidence your argument is inappropriately admitted, and you've answered my question. That's the latter, thank you. Okay, thanks, Mr. Drewes. We'll have you back on rebuttal, and the last counsel for the United States has come forward. Good morning, Your Honor. Adam Sleeper for the United States. Jump into the 404B, unless the court would like to begin with. No, let's let's start with this case. For most of this conversation, he's surrounded by three agents. They don't say he's free to leave. It seems like the agents had misled him and said they wanted to check up suspicious characters. Do these circumstances suggest that reasonably he should have understood that he wasn't free to stop the questioning? Your Honor, I think that what's significant here is the defendant's relationship with these agents, and the fact that he was a confidential informant, that he had, in similar circumstances, provided or met with these agents there. So, well... Doesn't that actually cut against your That's just that that's the same as in the Jacobs case. In the Jacobs case, we looked at this woman who was an informant and said she didn't feel she was free to leave. She felt she had an obligation, and she didn't feel like they told her to come. Her contact told her to show up, and she showed up. She didn't think she could walk away. Why isn't that exactly the same here? By the way, I should have asked, is the gentleman, does he go by Pena or Columna or Pena Columna? Do you know? Pena Columna is my understanding, Your Honor. Okay. Okay. Mr. Drews is shaking his head. Okay. So, Mr. Pena Columna, it seems that he's unaware, at least for part of this time, that they're treating him as a suspect, which it pretty clearly is the case that they're treating him as a suspect shortly into their St. John interview. Why doesn't that mean he in fact feels he can't walk away? He's there under an obligation to be there and cooperate. Well, Your Honor, I think a few factual points. I think the first is the agents testified that at the time they went over, they were going over to speak to their sources in Pena Columna. Mr. Pena was And I don't even think the other side is disputing that. I think the dispute arises because approximately 15 minutes into this interview, they start asking about the jeep and it starts to be evident that they're suspecting him. And they don't even deny that. They own right up to it in their testimony at the suppression hearing. They believed he was engaged, involved in some fashion, and they wanted to find out what it was, and they kept questioning him. And at some point, we can arrest this guy. He's in it. So we take that as a given. If you think we've got that wrong, explain to me why that understanding is wrong. But then you'll have to explain why we shouldn't believe Agent Dominguez's or Officer Dominguez's own words. Taking it as a given that relatively early in the conversation, they believe he's involved and they're questioning him as such. Why doesn't that cut against your assertion that he was just a cooperating witness? No. At that point, he was a suspect. Yes, sir. So just get the timeline down. I think there's testimony that at the start of the conversation, the defendant was not a suspect. They thought he might have had some information, but the agent specifically testified to that. Understood. But I'm right, aren't I? That it's pretty early into this hour-long questioning, like maybe 15 minutes in, that they're believing, no, he's involved. And they're approaching it that way. Isn't that right? I think the testimony is that about 15 to 20 minutes in, the defendant agreed or admitted that or said that he had lent his vehicle. Yeah, and it's before that time that they're asking questions. But be that as it may, it certainly appears that they begin interrogating him as if he's a suspect. They call him, pull him over out of the blue. They actually use a ruse to stop him. They drive him to an isolated location. They're all armed. They don't show their weapons, but he's been with them. He knows they're armed. As Mr. Deruso says in his brief, every passenger seat in his vehicle has got an armed government agent in it. Would a person in an isolated parking lot, under directions, you go here and park with the whole car occupied by armed agents think, I'm free to go. I'm actually free to throw them out of my car, tell them to give me back my cell phone, which they ordered me to turn over with the passcode. I'm just free to go. Would a reasonable person think that under those circumstances? Your Honor, I think we need to look at the prior course of conduct. Well, that's true, but, and you can go ahead and answer that with your background if you want, but start off with a yes or no, because that's a yes or no question. My answer would be, Your Honor, if someone were to come, if this were to happen to a non-confidential informant, it was just someone pulled off the street and all of this were to go forward, I think certainly we would have to agree that that was, that someone was in custody. But you have to look at the circumstances surrounding this. This was a confidential informant, someone who had been a confidential informant for a number of years, who had met with these officers under similar circumstances in the past when he had been free to leave. Does it matter, does it matter that in their own minds they're thinking, we're going to arrest this guy? It's an objective test, but going to the question that was going back forth between Judge that they're thinking, this guy's in it, and they're asking him questions to get him to implicate himself so they can arrest him, which they decide they're going to do and call the U.S. Attorney's Office to verify they can do. Is all of that irrelevant to the idea of whether he's in custody? If I may, both a factual and a legal response to that. I think that the determination of arrest, you know, if we're talking about time frame, also was not something that would have arisen at the 15 to 20 minutes mark, and more around the 45 minute to the hour mark at the conclusion when there was contact with the U.S. Attorney's Office. And wasn't that during a period where Penny Columna was left in his own car with the keys by himself? Correct. There were no agents in the car. He was alone in the car with his own keys. Now, turning to the... would have fired up his engine and driven off? That's the position the government's got. I'm not sure that this idea that he would just take off without saying anything is... But the question is, in this course of... See you later? What was he going to do? Well, maybe he would... There could have been a... I think, well, first of all, at that 45 minute mark is not really the operative time frame here, because at that point, the questioning in St. John had concluded after they got out of the car. Okay. Well, you've made your factual assertion. You said you had a legal point, too. What's the legal point? Is it irrelevant that they've decided... I guess you're trying to neatly parse this by the timing, but it feels to me like this is more like a dimmer switch than an on-off switch. It's not like at minute 45, the light went on, let's get him. There's an accretion of questioning that gets more and more designed to have him implicate himself, and that's got to be happening before the 45 minute mark. They're thinking, he's in it, and they want to get him. So let's assume, just for the sake of discussion, that that's the way the real world operates, and that's what's going on here. Is that designing their questions and putting them to Mr. Pena-Columna, is that irrelevant to the question of whether he's A, in custody, and B, being interrogated? No, Your Honor. It's not irrelevant. I think the court's case law is pretty clear that that's one of the factors. But the reason that that is a significant factor is not because there is this subjective understanding of the officers out in the ether, but because that subjective intent may be reflective of the what may have been presented to the defendant. And here, there just isn't any, there wasn't any testimony that the questioning of the defendant was conducted in a hostile or overbearing way. Well, it was certainly intended to get him to implicate himself. Once it occurred to them he was involved, they wanted a confession, and they got it. You're not suggesting that it was accidental that he confessed, are you? They were asking the questions to get him to confess. No, Your Honor. And let me clarify my point. My point is not that they were not asking questions to get information from him about this event, which could potentially lead to his arrest. My point is that it goes to how they might have been asking the questions. If someone, if they think that a defendant is guilty, it can lead to questioning that may be more aggressive or hostile. But there's no other testimony here. There's nothing indicating that the questioning here was overbearing or hostile, that there were the type of interrogation tactics that were used in the Jacobs case. I think there's a number. Well, when you say overbearing and aggressive, in that case, what you're characterizing as overbearing and aggressive was they showed her a suitcase. The officer showed her the suitcases that were of the type that were used in the crime and confronted her with that and basically said, we know you're involved. But leave that to the side for just a minute. I'm not sure there's that big a contrast between Jacobs and this, but let's turn to the invocation of the right. And I want to read you what I understand to be the exchange to be. And you help me out with this if you would, because this is something that I don't, neither side seem to focus on this, but it struck me and I'm curious if I'm just off base. Officer Dominguez says, this is in St. Thomas, they've got him in the interview room. If you want to talk to us, we need you to say, yes, I'm going to talk to you without an attorney. This is that point in the conversation that Judge Schwartz was talking about after they've Mirandized him and he starts to say something and Officer Dominguez stops him. If you want to talk to us, we need you to say, yes, I'm going to talk to you without an attorney. If you want an attorney, you can have an attorney. The conversation we're going to have is the same as the one we already had. And then there's some back and forth in English among the agents. And the next words out of Columna's mouth is no. Then there's the transcript says unintelligible. If I'm under arrest, I need an attorney. I mean, even if I, if afterwards, you know, the family can get me another one, a main one, no, because I am already under arrest and I used to work for you, right? So what are we to make of the word no in that he, Dominguez has said to them, we need you to say yes, I'm going to talk to you without an attorney. Columna's first word is no. Is that not a statement in response to Dominguez saying, I'm not saying yes, that I don't want an attorney and I want to talk to you. I'm saying no, I don't want to talk to you without an attorney. Isn't that, isn't that all by itself a meaningful invocation of the right to counsel? Dominguez has put it to him starkly and said, we need you to say yes. And his first word is no. Your Honor, I think that when you look at the defendant's statement, you need to look at the full statement that he makes. And now I'm not saying as, you know, as defense counsel has said, if he invokes, it doesn't matter that if there's then some questioning and then the invocation becomes ambiguous later. But I think when determining whether the invocation is ambiguous or not, you have to look at the whole statement that's being made before, before the, the questioner jumps in. For example, if someone says, I want an attorney, if you think I need one, right? You don't stop at the end of, I want an attorney and say, look, there's been an invocation and you can't look to the rest of this. And I think that you can't just stop at the word no. No, I would agree with that. He goes on and says, if I'm under arrest, I need an attorney. At that point, he is under, is there, maybe I should ask this first. Is there a meaningful difference between being in custody and being under arrest? Is there a legal difference? For purposes of, of your right to counsel. Well, I don't think arrest matters at all for purposes of your right to counsel, which is what the questioners tried to explain to him multiple times. Okay. So the fact that they don't say to him, now you're under arrest until later, doesn't mean he wasn't actually under arrest. He'd been in custody since they led him, at least since the time, even if you ignore all of the St. John's stuff until they, they take him to the boat and they put him on the boat. I mean, he's, he's not free to leap off the boat and swim back to St. Croix. He's in custody, he's under arrest, right? Under any, any reasonable understanding of what that means by, by the time they're putting him on the boat and bringing him to St. Thomas. Well, what I think the agents were saying is that they had not conducted a formal arrest of him. I guess the better question is, is he in custody? He's, no, I'm asking it just the way I'm asking it. Is he under arrest? He's certainly in custody and that's why I'm pressing this point. Is there some meaningful difference in the law between the, the officer saying you're under arrest and them, you know, like if I handcuff you and I, and I frog march you to a jail cell and I put you in the jail cell and I never say the words, you're under arrest. Are you not under arrest? You're under arrest, right? You're in custody. It's the same thing, isn't it? Legally? I think so, your honor. I, you know, I think there's the concept of the de facto arrest. But I, but the... Here's why I'm asking you, because it almost feels like a game the officers are playing with him. Like we're going to, we're not going to say the word arrest to you, but he's clearly in custody and at that point when he says, if I'm under arrest, I need an attorney. Isn't he actually in the space you've been pointing to where he's saying, wait a second, I'm not a cooperating guy anymore. I, it looks like I'm under arrest. If I'm under arrest, I need an attorney. Why is that not a clear invocation of the right to counsel? Your honor, a few things about that. One, he's saying, if I'm under arrest, I don't know that that sort of conditional statement is an unambiguous invocation. Also, it ends with a question, right? Yeah. It's a combination of, if I'm under arrest, requiring the, a determination by the agents combined with questioning. There's just a number of things that make it not unambiguous. So when Davis says it has to unambiguously request counsel, your position is, and you've pointed to it, you know, he was a cooperating witness and they haven't told him, hey, you're no longer a cooperating witness. You're our suspect and you're under arrest. They haven't shared that piece of their thinking with him. The legal position of the United States is, if you ask a question about whether you're under arrest, you have not invoked your right to counsel. Well, your honor, let's put this a different way. Let's say that- Well, keep it my way and answer my question and then put it your way. You have not unambiguously invoked your right to counsel. And the reason why is the example that I'm about to give, your honor. What if a defendant said, if you have other independent evidence that I was involved in this crime, I want a lawyer. So are then the agents supposed to- That isn't what he said. And that's not the facts of this case. As you pointed out, there was some ambiguity, right? At least in his mind, there was ambiguity. There was no ambiguity in the officer's minds at this point, but there's ambiguity in his mind. And he says, if I'm under arrest, I need an attorney. Now, you can say, I need an attorney and put a question mark at the end, the way the transcript puts it. Or you can say, I need an attorney. But whether it's the voice going up or the voice going down, however they chose to do it on the transcript, isn't the statement in the context, the very context you're pressing us to an attorney. Why isn't that unambiguous? Because your honor, he immediately says, he's asking for the agents to provide what they think he should do. When he asks- Isn't he asking them to verify whether or not he's under arrest? He's not asking whether they think he should get an attorney. He's asking, am I under arrest? Counselor, could I ask you, I have to answer Judge Jordan's question. I want you to read exactly what the transcript says. So answer Judge Jordan's question based upon how he expressed it. If he had said, if I'm under arrest, I need an attorney, period, would that be an assertion? Just a moment, we're having technical difficulties. This is a curse. We're going to take it right out. We're going to remove that for a moment. It's going to be some serious teasing that goes on. All right. Maybe I'll let Judge Jordan ask this question again, if you could. No, no, no. You go ahead and read the transcript. Can you read, do you have it in front of you? I do, I do have it. Can you read the excerpt so that, so we have it? Yes. No, unintelligible, that if I'm under arrest, I need an attorney. I mean, even if afterwards, you know, the family can get another one too, dot, dot, dot, a main one, comma, no, question mark, because I'm already under arrest and I used to work for you, right, question mark. I think that there's- I thought I read that, but go ahead. So to go to Judge Jordan's question, I don't think that that statement alone would be an unambiguous invocation because it's requiring a determination about arrest. It's a conditional request for the attorney. How does that fit with Burgess versus Tompkins? I'm sorry, Your Honor, could you clarify your question? The standard in Burgess versus Tompkins seemed to be whether it's unequivocal or not. And one of the problems with these transcripts is we don't really know what the punctuation is or the tone is, et cetera. So if we're not sure, what does Burgess tell us about either who bears the burden of proof or which way we lean here? So if we're not sure, it's not unambiguous, Your Honor. And what Davis talks about is if we're not sure, then there is no obligation on behalf of the officer to clarify. And it's a best practice that the officers can engage in. And here, I really think that's what the officers did, is I think what these questions about arrest were is there may have been a fundamental disconnect about de facto arrest versus a formal arrest. Now, I don't think that the agents were, when they were saying you're not under arrest, were not saying, they're not making a legal determination about de facto arrest, they were saying, look, we haven't placed you under formal arrest, then now we're not taking you in front of a, we've not, you know, set up the processes for taking you in front of a magistrate judge. And it seems like there's a disconnect between the defendant and the agents. And when that disconnect really seems to be interfering with the discussion, what do they do? They go, they take a break, they make the determination that there is, in fact, going to be an arrest. They tell the defendant that, and then they give him his Miranda rights. And then there's continued statements from Officer Dominguez, right? Because part of the, part of what happened here is the district court said, well, you invoked it, you waived it. But that waiver has to be clear and unambiguous too, right? You're not allowed to take an eight minute break the way they did here and go back and reinitiate a conversation after there's been an invocation of counsel, right? I agree with that, Your Honor. If there was an invocation, they couldn't come back. I just have one question, just that one question on 404B. In the opening, the government describes Melasco and Columna as longtime partners. Presumably, if one opens on with such a statement, they expected to deduce evidence on that point. If that's the case, why wasn't 404B notice on the pre-September 2019 activity provided? Your Honor, so I, there is a bit of a convoluted procedural history of how this came in, so I'm just going to run through it briefly, if I may. I know I'm over, well over time. But I want you to, I understand, I understand how it came in at the trial, but my question focuses on the obligation to give 404B notice pre-trial. The fact that trial has commenced, the government makes the statement, these two folks were in a longtime relationship, and presumably one doesn't open unless they expect to deduce evidence of it. So my question really goes to, why wasn't 404B notice on that point, since we opened on it, the government opened on it, given? Well, Your Honor, the government's view, and this was the view taken at the sidebar during the opening statement, is that this was not 404B evidence, that it's, in fact, intrinsic evidence of the conspiracy that was charged. Even though the charged conspiracy said before some unknown time through September 25th or 26th, 2019, that was the argument? Yes, Your Honor. There was then a lot of pushback from defense counsel. The, actually at that point, the judge said that he would admit it, subject to connection, well, that he would permit it, subject to connection, as evidence of the actual conspiracy. Then the next day, the defendant objected again, saying that this was 404B evidence, and the judge said, at that point, the government said that it would, trying to resolve some of these issues, said it would only present evidence from September as intrinsic evidence, unless the defendant opened the door by really getting into these other things. Right, and I'm familiar with how the rest of this played out. You've answered the question that I had. Thank you. Understood. All right. Thanks, Mr. Sleeper. We'll hear from Mr. DeRuzzo on rebuttal. Thank you, Your Honor. Judge Jordan, out of the, your first question to my esteemed colleague was about Jacobs. I actually think Brownlee's a better case for me. If I turn the court's attention to some statements, and I'm between the officer and Brownlee, as described by the officer, increased rather than decreased the importance of Miranda warnings. Going on, no suspect needs Miranda warnings more than one question by a law enforcement officer that the suspect assumes is a quasi-confidant. Your Honor, I think in this context, both under Brownlee and Jacobs, the fact that my client was a as you pointed out, gives greater weight to my argument that Miranda was absolutely necessary, and that Miranda should have been given sooner rather than not at all. Well, you need to wrestle with the punctuation, so to speak. Is it ambiguous when he's asking questions as opposed to making assertions? If we take the transcript as it stands, and there's a question mark at the end of that, does that put it into the zone of ambiguity, and hence into the Davis zone, where one would say, well, we can't be sure, as Mr. Sleeper put it. It is therefore ambiguous. It is therefore not an unambiguous invocation of the right, and therefore, Pena-Columna loses. Well, I would point out, and I would agree with Judge Bevis, that we have a problem with transcripts. If this were a conversation only in English, it'd be very different. But when you have conversations in Spanish, right, where you have, and I have no idea where the person who did the translation, if they are from the same country as my client. But you've got very different differences in dialect. You've got differences. But no one made that argument or challenge before the district court, right? Burgess and Davis seem to say, look, if it's unequivocal, we'll respect it. If not, you know, the burden seems to be on your client to make it clear that he wants to stop. And they didn't force him or coerce him, but he didn't make clear he's thinking about it out loud. I'm not going to dispute the majority of that, Judge. But what I would say is this, that in the context of cases where you have, where English is not the only language, in other words, where Spanish is being translated, for the courts, you know, edification, you know, English, I think, has like two or three times the number of words as Spanish, which is why for commercial transactions, contracts are almost internationally always done in English. And to the extent that there's a problem between Spanish and English, you know, translation, the English controls. Now, I know I'm getting a little far afield here. Yeah, you are, because it's not in the briefing. It's nowhere are you. So let's stay off of the translation problems. And I guess your position is, and it has to be, well, yeah, even as written, that's unambiguous. Yes, absolutely, Judge. Was the video played? I know it's part of the record. I've watched it. But was the video played at the suppression hearing? At the suppression hearing or at the trial? At the suppression hearing. I actually don't believe. And whether it was played. Whether it was played before the district court. But it was in the record. I mean, we have it as part of the record. Yes. It was offered into evidence. Yes, it's GX20. And I believe Mr. Sleeper provided the actual video to the court for the court's consideration. That's okay. I just want to clarify that. Thank you. But with that being said, if there are no further questions, I ask the court to vacate my client's conviction and remand for a new trial. Thank you very much. Thank you. We appreciate the counsel's argument. We'll take it under advice.